No. 54,065

AMERICAN MEDIA, INC., *Appellee,* v. THE HOME INDEMNITY
COMPANY, *Appellant.*

(658 P.2d 1015)

Opinion filed
February 19, 1983.

*Roger M. Theis,* of Render & Kamas, of Wichita, argued the cause, and *Paul L. Thomas,* of the same firm, was with him on the brief for appellant.

*David A. Gripp,* of Crockett & Gripp, of Wichita, argued the cause, and *David G. Crockett,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by defendant, The Home Indemnity Company (The Home) from a judgment of the Sedgwick District Court finding that plaintiff, American Media, Inc. (AMI), an insured, was entitled to recover a judgment for some $34,000 against The Home under the provisions of a policy of insurance issued by the defendant.

The matter was presented to the trial court on a written stipulation of fact, which is substantially as follows: American Media, Inc., was a holding company owning stock in three subsidiary corporations. Each of the subsidiary corporations was incorporated separately and was a different corporate entity. AMI owned 93.65 percent of the stock of Mr. D's Radio, Inc., which operated radio stations KBUL and KEYN-FM in Wichita, Kansas; 93.1 percent of the stock in American Radio Corporation (ARC), an Oklahoma corporation, which operated radio station KOFM-FM in Oklahoma City, Oklahoma; and 96.7 percent of the stock in American Radio Corporation of Kansas (ARCK), which operated radio stations KCSJ and KDJQ (FM) in Pueblo, Colorado. AMI was created specifically to hold the stock of and to manage the other three corporations. All the corporations had identical officers and directors.

The Home Indemnity Company issued its policy to Mr. D's Radio, Inc., providing workers' compensation coverage to Mr. D's in the State of Kansas for the policy period April 17, 1975, to April 17, 1976. An All States Endorsement attached to the policy further provides:

"A. In the event the insured undertakes operations in any state [other than Kansas] . . . the company agrees as follows:
"1. To reimburse the insured for all compensation and other benefits *required of the insured* under the workmen's compensation or occupational disease law of such state." (Emphasis supplied.)

On April 25, 1975, AMI was endorsed as an additional insured on the policy.

On July 28 or 29, 1975, during the policy period, Gloria Saldana, an employee of ARCK, was injured in the course and

scope of her employment with radio station KCSJ in Pueblo, Colorado. At that time, ARCK carried no workers' compensation insurance. At the conclusion of proceedings (brought by Saldana against ARCK before the Colorado workers' compensation authority, the Colorado Division of Labor), ARCK was ordered to pay Gloria Saldana compensation, medical expenses and penalty in the amount of $32,176.35.

Because of limited funds on the part of ARCK, portions of the judgment were paid by AMI directly by AMI checks; other portions of the judgment were paid by KCSJ check using funds which had been forwarded to it by AMI.

In addition to the written stipulation set forth above, the parties orally stipulated that an employee of The Home audited the payroll records of AMI and Mr. D's on May 25, 1976. Policy premiums were calculated, based on those payrolls. The auditor was not shown the payroll records of ARC or ARCK, and the employees of those two corporations were not considered in fixing the policy premium. Had they been included, the premium would have been larger.

The trial court stated the controlling question in the case as follows:

"Were the benefits paid to the employee of a wholly-owned subsidiary corporation of the plaintiff required to be paid by plaintiff under Colorado law?"

The court then quoted the All States Endorsement of the policy, and concluded:

"The key to examination of this situation is not whether the plaintiff would benefit by piercing the corporate veil, but whether the plaintiff could invoke that veil to escape liability for the loss of the subsidiary's employee. In my opinion, the Colorado Court would pierce that veil in an instant if it were necessary to do so in order for the worker to recover."

The court thus based its resolution of the lawsuit on what it thought a Colorado court would do *if it were necessary, in order for the worker to recover.* We conclude that this was error.

Before going further, we should first review the general rules for construction of insurance policies. In the case of *Mah v. United States Fire Ins. Co.,* 218 Kan. 583, 586-87, 545 P.2d 366 (1976), we said:

" 'In construing an insurance policy a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter and the purpose to be accomplished. . . .

" 'Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense . . . .' (*Bramlett v. State Farm Mutual Ins. Co.,* 205 Kan. 128, 130, 468 P.2d 157.)

" '. . . As a general rule, the construction and effect of a written contract of insurance is a matter of law to be determined by the court. If the facts are admitted, . . . then it is for the court to decide whether they come within the terms of the policy. . . .' (*Goforth v. Franklin Life Ins. Co.,* 202 Kan. 413, 416, 449 P.2d 477.)

" 'The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Since the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured. If, however, the contract is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, and there is no need for judicial interpretation or the application of rules of liberal construction; the court's function is to enforce the contract according to its terms. . . .' (*Goforth v. Franklin Life Ins. Co.,* supra, p. 417.)

" 'When an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made. . . . To be ambiguous the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. . . . Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. (Citing cases.)' (*Clark v. Prudential Ins. Co.,* 204 Kan. 487, 491, 464 P.2d 253.)

" ' '. . . [W]here a contract is unambiguous it must be enforced according to its terms. . . .' ' (*Simpson v. KFB Insurance Co., Inc.,* 209 Kan. 620, 624, 498 P.2d 71.)"

In *Fancher v. Carson-Campbell, Inc.,* 216 Kan. 141, 145-46, 530 P.2d 1225 (1975), we said:

"The test to be applied in determining the intention of the parties to an insurance policy is not what the insurer intended the policy to mean, but what a reasonable person in the position of the insured would understand it to mean. Since an insurer prepares its own contracts, it has a duty to make the meaning clear, and if it fails to do so, the insurer and not the insured must suffer. Thus, if the terms of an insurance policy are ambiguous or susceptible of more than one meaning, the meaning most favorable to the insured must prevail."

Finally, we should note that as between the employer and the insurer, the usual incidents of insurance law apply. 4 Larson,

Workmen's Compensation Law § 94. We should emphasize that the injured employee is not a party to this action; the employee has already received the workers' compensation to which she was found entitled under the provisions of the Colorado law, applicable where the injury occurred. The issues here are between the insured and the insurance carrier.

The parties view the issues differently. The defendant contends that it did not intend to cover employees of ARCK and that neither Mr. D's nor AMI, as insureds under the policy, intended the policy to cover the employees of ARCK. Defendant also argues that AMI's payments were voluntary and not required of it, and therefore were outside the coverage provided by the All States Endorsement; and that AMI should not be allowed to "pierce the corporate veil" for its own benefit and thereby extend coverage to parties not designated as insureds in the policy. AMI does not argue the intent issue. It contends that since ARCK had no workers' compensation insurance, AMI, as the parent corporation, was obligated under Colorado law to pay the workers' compensation award. It then concludes that since it was required to pay the workers' compensation benefits, it, as a named insured, is clearly entitled to be reimbursed by The Home under the terms of the All States Endorsement of the policy. It does not argue that ARCK is insured under the policy; it simply asserts that it paid an obligation which The Home agreed to meet.

Is the intention of the parties to a workers' compensation insurance contract pertinent to the determination of coverage as between the insured and the insurer? We conclude that it is. In 100 C.J.S., Workmen's Compensation § 372, under Risks and Coverage, we find the following discussion:

"In general, the coverage of workmen's compensation insurance is that stated in the policy, which, together with the law of the state under which the insurance contract was made, fixes and limits the insurance carrier's liability. The extent of the coverage of a policy is not to be found only in the declarations attached thereto, and other clauses therein, and the provisions of the workmen's compensation act, must be considered, as must the rules of the industrial commission. *The insurance carrier must be deemed to have intended to insure the enterprise on whose payroll the premium is based.*

"Insurer is not liable for a risk which it did not insure; the policy risk is confined to the employees of insured, and does not include employees of other employers. . . .

. . . . .

"Where an employer and his insurer intend to insure only one of two or more businesses engaged in by the employer, but under the terms of the policy and the compensation act insurer is liable to employees injured in the business not intended to be insured, nevertheless, as between the employer and insurer, the policy does not cover such employees, and insurer may recover from the employer the amount expended in payment of the award to the employee." (Emphasis added.) pp. 84-89.

In the case at hand, Mr. D's Radio, Inc., and American Media, Inc., were the named insureds; neither ARC nor ARCK were included as insureds in the policy. When the payroll records were audited some ten months after the employee was injured, payroll records of ARC and ARCK were not disclosed. The insurer was not informed of the corporate structure, of the existence of ARC and ARCK, or of their employees. There is no evidence that either AMI or The Home intended that the policy provide coverage for employees of ARC and ARCK, and we find that the parties did not intend for those employees to be covered.

This brings us to the principal and controlling issue: Were the compensation and benefits paid by AMI or with funds furnished by it to Gloria Saldana "required of the insured," under the Workmen's Compensation Law of Colorado, as that phrase is used in the endorsement to the policy? AMI was not a party to the Colorado workers' compensation proceeding. No judgment was entered against it. No claim was asserted against it by the injured employee. Judgment was entered only against ARCK, doing business as Radio Station KCSJ. There is no showing that ARCK was unable to pay the judgment; the stipulation indicates only that, "Because of limited funds on the part of ARCK," the judgment was paid by AMI or with funds provided by it. "Required of the insured" carries a connotation of compulsion or legal obligation; it does not imply voluntary action, even though such acts may be prudent, expedient, or good business practice. In *Newcomb v. Victory Life Ins. Co.*, 159 Kan. 403, 407, 155 P.2d 456 (1945), we discussed the meaning of "required" as follows:

"The normal meaning of the word 'required' is to demand; to claim as by right and authority; to exact."

"Require" is defined in Webster's Third New International Dictionary as:

"[T]o ask for authoritatively or imperatively: claim by right and authority: insist upon [usually] with certainty or urgency . . . to impose a compulsion or command upon . . . ."

The Colorado workers' compensation authorities did not determine that AMI was liable for the compensation; no Colorado court has so held; and upon the record before us, we are unable to say with certainty what determination Colorado authorities or courts might have made, had the issues been raised.

The policy provision is clear and unambiguous, and as between the parties is entitled to be construed in accordance with the plain and ordinary meaning of its terms. The Home is obligated to reimburse its insured only when compensation and other benefits have been "required of the insured." The fact that the compensation was paid by AMI or with its funds is not determinative of the issue; the facts clearly indicate that AMI made payment and furnished funds voluntarily and not because of any compulsion or legal requirement.

We have not overlooked the various other arguments and authorities presented in the briefs of the parties, but we find them unpersuasive. For the reasons stated, the judgment is reversed.

HERD, J., not participating.